UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **LION RAISINS, INC.,** | ) | **1:03-cv-6744 OWW DLB** |
| | ) | |
| **Plaintiff,** | ) | **MEMORANDUM DECISION AND** |
| | ) | **ORDER RE DEFENDANT'S MOTION** |
| **v.** | ) | **TO DISMISS (DOC. 71) AND** |
| | ) | **MOTION TO STRIKE (DOC. 72).** |
| **THE CONNECTICUT INDEMNITY** | ) | |
| **COMPANY, a subsidiary of ROYAL &** | ) | |
| **SUN ALLIANCE, AND DOES 1 through** | ) | |
| **10, inclusive,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## I.   <u>INTRODUCTION</u>

This case concerns a dispute over workers' compensation insurance issued by the Connecticut Indemnity Company ("Defendant" or "CIC") to Lion Raisins, Inc. ("Plaintiff" or "Lion Raisins"). Lion Raisins alleges that CIC breached the insurance contract and administered claims negligently and fraudulently. (*See* Doc. 55, Second Amended Complaint ("SAC"), filed Oct. 17, 2005.) CIC moves to dismiss the entire complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Doc. 71, filed Nov. 29, 2006.) CIC also moves to strike certain portions of the complaint. (Doc. 72, filed Nov. 29, 2005.)

1

## II.  **PROCEDURAL HISTORY**

Plaintiff, "a large processor of raisins, with its principle place of business located in Selma, County of Fresno, California," initially sued only Royal & Sun Alliance ("RSA") in the Superior Court for the County of Fresno for (1) breach of contract, (2) negligence, (3) intentional misrepresentation, and (4) negligent misrepresentation.  (Doc. 1, Ex. A, filed Oct. 27, 2003.)

RSA removed the case to federal court pursuant to 28 U.S.C. § 1441(b) based on diversity of citizenship.  (Doc. 1.)  RSA then moved to dismiss, or in the alternative for summary judgment, on the ground that it was not the correct defendant.  (Doc. 6, filed Dec. 8, 2003.)[1]  By memorandum decision and order issued February 11, 2004, RSA's motion to dismiss was granted because Lion Raisins had failed to establish any relationship between RSA and itself.  Plaintiff was given twenty days (20) to amend its complaint.  (Doc. 16.)

On February 26, 2004, Lion Raisins filed a first amended complaint ("FAC") against CIC.  (Doc. 17.)  Plaintiff then moved to amend a second time to clarify its allegations.  (Doc. 47, filed Sept. 13, 2005.)  Leave to amend was granted (Doc. 54, filed Oct. 14, 2005), and Plaintiff filed a second amended complaint ("SAC") on October 17, 2005.  (Doc. 54)

---

[1]     Although it is not disputed that CIC issued the relevant workman's compensation insurance policy to Plaintiff, Plaintiff alleged in the initial complaint that CIC is authorized to write policies for RSA "a large European insurance company that bought [CIC] and uses it as a base for operations in the United States."

### III.   <u>FACTUAL ALLEGATIONS IN THE COMPLAINT</u>[2]

A.   <u>The Operative Workers' Compensation Policy</u>.

On or about January 1, 2003, Plaintiff entered into a contract with Defendant for the provision of state-mandated workers' compensation and employer's liability insurance.  (SAC ¶10.)

A complete copy of the policy is attached to the declaration of Spencer E. Kook.  (Doc. 73, Ex. B, Policy No. CFS10027100.) The policy, which was issued in the name of CIC by its agent Cibus Insurance Services, includes several provisions concerning premiums:

### PREMIUM DISCOUNT ENDORSEMENT

The premium for this policy and the policies, if any, listed in Item 3 of the Schedule may be eligible for a discount.  This endorsement shows your estimated discount in Items 1 or 2 of the Schedule.  The final calculation of premium discount will be determined by our manuals and your premium basis as determined by audit.  Premium subject to retrospective rating is not subject to premium discount.

*   *   *

(*Id.* at 14.)

### ESTIMATED ANNUAL PREMIUM ENDORSEMENT - CALIFORNIA

The premium with respect to the insurance provided by this policy...<u>is subject to experience modification</u>. The experience modification, when issued, will be effective on 1/1/00, your normal anniversary rating date.  Pending the issuance of the experience modification by the Workers' Compensation Insurance Rating Bureau of California, the estimated annual premium shown below is based on the experience modification previously applicable to your operations. The estimated annual premium will be revised when the Bureau issues the applicable experience modification.

---

[2]   This background section is based upon the facts alleged in the Second Amended Complaint, which must be presumed true for purposes of this motion to dismiss.

3

1    Estimated annual premium[:] $ 256,857

2    The estimated annual premium shown above is based on a
     prior experience modification of 1.46 which was
3    effective on 01/01/99.

4    **NOTE: THE ESTIMATED ANNUAL PREMIUM MAY BE INCREASED
     WHEN THE BUREAU ISSUES THE EXPERIENCE MODIFICATION
5    APPLICABLE TO THIS POLICY.**

6  (*Id.* at 15 (bold emphasis supplied, underlining added).  Among

7  other terms and conditions, the policy also provides:

8    [CIC has] the right and duty to defend at our expense
     any claim, proceeding or suit against [Lion Raisins]
9    for benefits payable by this insurance. [CIC has] the
     right to investigate and settle these claims,
10   proceedings or suits.

11  (*Id.* at 16.)

12    B.    __Other Background Allegations__.

13    Plaintiff alleges that workers' compensation insurance

14  providers are "responsible for not only providing the coverage

15  for the employer, but...for providing claims, administration and

16  guidance to the injured employees and the employer as to the

17  rules and regulations of the workers' comp system."  (SAC ¶14.)

18  Plaintiff maintains that "[c]laims examination is a highly

19  entailed legal area..." (SAC ¶15.)

20    Competent examination, by the carrier...allows for the
     medical treatment and full recovery of the injured
21    employee, but allows for the interaction between the
     employer and the claims examiner to provide recovery of
22    the employee.  It also allows for a smaller amount of
     insurance money being spent and faster return to work
23    of the employee.

24  (SAC ¶16.)

25    Plaintiff further alleges that workers' compensation

26  providers are also supposed to facilitate a "final audit," which

27  Plaintiff describes as "an examination of the losses incurred

28  during the policy year, as well as an audit of the premium paid

by the employer...”   (SAC ¶18.)   The term “final audit” appears to be somewhat of a misnomer, as several audits are supposed to be performed for each policy year.   An initial audit is conducted six months after each policy year ends and includes an estimate of the costs that are likely to be incurred in the future as a result of claims that are still open from the particular policy year.   The insurer also performs subsequent valuations of the losses to either correct or adjust the estimates contained within the initial audit.   These subsequent valuations are supposed to extend for two years after the initial audit.   Accordingly, each policy year results in a set of audits that cover three years of costs incurred as a result of claims filed in that policy year. The information contained within the initial audit and subsequent valuations is then used by the Workers’ Compensation Insurance Rating Bureau (WCIRB) to determine an “experience modification,” which is essentially a factor reflecting the insured’s premium to loss ratio.   (*Id.*)

According to the complaint

> It is important that the WCIRB receive these reports from the insurance companies...in a timely manner, usually six months prior to the renewal date of the policy, so that the WCIRB can properly calculate the experience modification.   When this does not happen, then the modification cannot be calculated correctly, and one ends up with confusion, higher premiums, and usually negligence on several fronts.

(*Id.*)   A favorable X-Mod can lead to substantial discounts off of current-year premiums if the insured’s actual losses are less than the insured’s actual premiums.   (*See* SAC ¶20.)   However, if an insured’s actual losses are higher than the actual premiums, the insured’s X-Mod would be affected for three years from the

1   initial calculation.  (SAC ¶21.)

2       Plaintiff alleges that an insured company's X-Mod is

3   "directly affected by how claims are handled by the insurance

4   company."  (SAC ¶22.)  If claims are managed well, the insured will

5   see benefits through a lower X-Mod.  If the claims are mis-managed,

6   however, or, alternatively, if the employer is unsafe, the X-Mod can

7   be adversely affected.

8       **C.   <u>Allegations of Mismanagement</u>**.

9       Plaintiff alleges that CIC mis-managed its claims in a variety

10  of ways.

11      <u>Chaotic claim administration</u>:  For the policy year 2000,

12  Plaintiff reported 58 injuries.  (SAC ¶23.)  Plaintiff complains

13  that as of March 2001, 26 of the claims were "still open and

14  active," of which 16 were considered "out of control."  (*Id.*)

15  Plaintiff further complains that in 2001, Lion Raisin

16  representatives spoke with five different claims examiners, "none of

17  whom would handle Lion's cases for more than approximately four

18  months.  Each of them had a different approach and a different

19  priority.  This resulted in chaos, nobody could decipher what the

20  last examiner was doing or had accomplished." (*Id.*)  In October

21  2001, Cibus Insurance, which is authorized to write policies for

22  Defendant, stepped in and placed Lion Raisin's claims under third-

23  party administration.  Since the claims were transferred to the new

24  administrator, Lion Raisins has had one claims manager and open

25  cases were reduced to ten by August 2003.  (*Id.*)

26      <u>Uncontrolled Medical Costs</u>:  The "remarkable rotation of claims

27  examiners employed by the Defendant resulted in many cases and

28  injured employees going unchecked through the system."  (SAC ¶23.)

**6**

1   CIC allowed injured employees to "do what they wanted and go to

2   whatever doctor they wanted."  For example, one employee whose nose

3   was broken in 2000 when another employee punched him, was allowed by

4   CIC to run up medical bills exceeding $35,000.00 before his case was

5   closed in 2003. (*Id.*)

6       <u>Untimely Preparation and Forwarding of Audits and Related</u>

7   <u>Irregularities</u>:  Although the 2000 final audit was completed in a

8   timely fashion by mid-2001, it was never forwarded to WCIRB.  (SAC

9   ¶24.)  "Defendant, inexplicably, told the WCIRB that the audit had

10  been lost." (*Id.*)  Lion Raisins' 2002 premium should have been

11  calculated based on the audits from 1998, 1999, and 2000.  However,

12  when it came time to calculate the 2002 premium, WCIRB had not yet

13  received Plaintiff's audit from CIC for the 2000 premium year.  As a

14  result, the 2002 premium had to be calculated based on 1997, 1998,

15  and 1999 audits, resulting in an X-Mod of 140%.  Lion Raisins

16  asserts that, had the 2000 audit been completed and forwarded to

17  WCIRB in a timely manner, the X-Mod would have been more favorable

18  and would have resulted in a lower premium for 2002.  This resulted

19  in "hundreds of thousands of dollars of damage to Plaintiff –

20  through higher premiums." (SAC ¶24.)

21      In December 2002, CIC forwarded to WCIRB the "second valuation

22  audit" for the 2000 year, which was conducted in June 2002.  This

23  audit indicated a loss of $1,985,000.00 and that Lion Raisins had

24  paid only $300,000 in premiums for 2000 (a loss to premium ratio of

25  over 600%).  Lion Raisins was informed that their X-Mod for 2003

26  would accordingly be set at 185%.  In May 2003, CIC finally

27

28

**7**

forwarded to WCIRB the first valuation, calculated in June 2001.[3]
Taking this audit information into consideration, WCIRB recalculated
Plaintiff's X-Mod for 2002 to be 167% and determined that Lion
Raisins owed its insurer an additional $97,000.00 in additional
premiums for the 2002 policy year.  The complaint further alleges
that CIC's conduct "caused Plaintiff's X-Mod premium for 2003 to
increase over $500,000.00... [and] will cause Plaintiff's premium to
be set higher in 2004."

The SAC sets forth causes of action for (1) breach of contract;
(2) breach of the implied covenant of good faith and fair dealing;
(3) intentional misrepresentation; and (4) negligent
misrepresentation.

## IV.   STANDARDS OF REVIEW

### A.   Motion to Dismiss.

Fed. R. Civ. P. 12(b)(6) allows a defendant to attack a
complaint for failure to state a claim upon which relief can be
granted.  A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is
disfavored and rarely granted:  "[a] complaint should not be
dismissed unless it appears beyond doubt that plaintiff can prove no
set of facts in support of his claim which would entitle him to
relief."  *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir.
2002) (citations omitted).  In deciding whether to grant a motion to
dismiss, the court "accept[s] all factual allegations of the
complaint as true and draw[s] all reasonable inferences in favor of

---

[3]     Plaintiff alleges that it never recieved a copy of this
first valuation and questions why it took "the Defendant two years
to find it and/or send it in to the WCIRB" and suggests that CIC
might have made it up.

8

the nonmoving party." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

"The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citations omitted).  For example, matters of public record may be considered under Federal Rule of Civil Procedure 201 including pleadings, orders and other papers filed with the court or records of administrative bodies.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Conclusions of law, conclusory allegations, unreasonable inferences, or unwarranted deductions of fact need not be accepted.  *See Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

**B.   Motion to Strike**.

Pursuant to Federal Rule of Civil Procedure 12(f), a party may move to strike from any pleading "any redundant, immaterial, impertinent or scandalous matter."   Motions to strike are disfavored and infrequently granted.  *Neveu v. City of Fresno,* 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005) ("[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.").

**V.   ANALYSIS**

**A.   Motion to Dismiss Breach of Contract Allegations**.

9

1   In general, a breach of contract claim consists of the

2   following elements: "(1) the contract, (2) plaintiff's performance

3   or excuse for nonperformance, (3) defendant's breach, and (4)

4   resulting damages to plaintiff." *Careau & Co. v. Sec. Pac. Business*

5   *Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990).  More

6   specifically, a plaintiff must plead "the existence of a contract,

7   its terms which establish the obligation in issue...and the breach

8   of that obligation." *FPO Devel., Inc. v. Nakashima*, 231 Cal App. 3d

9   367, 382 (1991).

10   The specific allegations related to the breach of contract

11   claim are set forth in paragraphs 29 and 30 of the SAC:

12       29. Under the contract that Plaintiff had with the
Defendant, and [as] is required by the State of
13   California, <u>Defendant was to estimate the ultimate cost
of unsettled claims for statistical purposes 18 months</u>
14   <u>after the policy becomes effective and promptly report
those estimates to the WCIRB no later than 20 months</u>
15   <u>after the effective date of the policy</u>. At 12 month
intervals thereafter, Defendant would update and report
16   to the WCIRB the estimated cost of any unsettled claims
and the actual final cost of any claims settled in the
17   interim. Those amounts that the Defendant reports would
be used by the WCIRB to compute Plaintiff's experience
18   modification - and thus Plaintiffs premium.

19       30. Expressly stated and implied in the contract (policy)
that Plaintiff had with the Defendant, Defendant was to
20   <u>provide top-notch claims representatives to handle all of
the claims of Plaintiff's employees</u>, <u>control the costs</u>,
21   <u>keep Plaintiff informed</u>, <u>get the employees back to work
as quickly as possible</u>, <u>eliminate unnecessary doctors
22   visits, medical expenses</u>, <u>and time off from work that are
unnecessary</u>, <u>and claimed that its first responsibility
23   was to its customers...</u>, <u>and employ an experienced staff
to handle employees workers' compensation claims</u>.
24   Defendant was also required to <u>report promptly to the
WCIRB the audit report</u>, knowing that that report and that
25   prompt report, and that accurate report, would be used by
the WCIRB for the following three years in order to
26   determine Plaintiff's premium, a substantial portion of
which inured to the benefit of the Defendant.

27   (emphasis added).

28

**10**

1    Defendant asserts that none of these alleged duties are
2    contained within the express written terms of the policy.
3    Plaintiff has not attached a copy of the policy to the complaint
4    or any other filing in this case.  Defendant, however, attaches
5    to the declaration of Spencer Y. Kook a document that purports to
6    be a copy of the policy.  (*See* Exhibit B to the Kook Declaration,
7    Doc. 73, filed Nov. 29, 2005.)    Plaintiff argues that the court
8    should not consider this document because it is not competent
9    evidence.  Specifically, Plaintiff argues that (1) Kook's
10   declaration does not provide an adequate basis to authenticate
11   the policy for purposes of this motion, as he does not assert
12   having "personal knowledge of the forms and endorsements that
13   comprise the CIC policies"; and (2) although the policy as
14   submitted indicates that ten forms and endorsements should be
15   attached, only five are included.  (Doc. 88 at 5.)  Defendant
16   correctly points out that in the context of a motion to dismiss,
17   a court may consider documents relied upon in the complaint when
18   their authenticity is not in question.  *Parrino v. FHP, Inc.*, 146
19   F.3d 699, 705-06 (9th Cir. 1998).  Here, apparently, the policy
20   presented by Defendant was produced by <u>Plaintiff</u> in discovery.
21   Although Plaintiff raises some questions as to its <u>completeness</u>,
22   Plaintiff has not raised any genuine doubt as to its authenticity
23   as having been furnished by defendant to plaintiff as the workers
24   compensation policy in force over the time period in dispute.
25   Plaintiff's breach of contract claim is based on the language of
26   this policy.  The proper remedy is for Plaintiff to submit any
27   missing parts of the document if they pertain to this dispute.
28        An examination of the plain language of the contract reveals no

mention of the "obligations" listed in Paragraphs 29 and 30 of the
SAC.  Nor does Lion Raisins point to any policy provisions which
obligate CIC to "provide 'top-notch' claims representatives,"
"control the costs," "keep Plaintiff informed," "get the employees
back to work as quickly as possible," "eliminate unnecessary doctors
visits, medical expenses, and time off from work,""employ an
experienced staff to handle employees workers' compensation claims,"
or "report promptly to the WCIRB the audit report."

Rather, a provision in the policy appears to grant CIC
considerable discretion over settlement negotiations.  The policy
provides that CIC has "the right and duty to defend at [its] expense
any claim... against [Lion Raisins] for benefits payable by this
insurance. [CIC has] the right to investigate and settle these
claims, proceedings or suits."  (*Id.* at 16.)  In *Western Polymer
Insurance v. Reliance Insurance* Co., 32 Cal. App. 4th 14, 24-26
(1995), a similar provision, which gave the insurer the the right to
"make such investigation and settlement of any claim or suit as it
deems expedient," entitled the insurer "to control settlement
negotiations without interference from the insured."  (*Id.* at 24.)

Lion Raisins responds by emphasizing a single clause in the
contract requiring CIC to "pay promptly when due the benefits
required of [Lion Raisins] by the workers' compensation law."  (SAC
¶11.)  California courts have acknowledged that similar language can
support a cause of action for breach of contract under similar
factual circumstances.  For example, *Security Officers Service, Inc.
v. State Compensation Insurance Fund*, 17 Cal. App. 4th 887, 894
(1993), concerned a similar insurance contract provision that
required the insurer to "pay promptly when due to those eligible

**12**

1  under the policy the benefits required of [plaintiff] by the

2  workers' compensation law."  The *Security Officers* court found that

3  plaintiff's allegations of delayed resolution of claims stated a

4  claim for breach of the "pay promptly" contract provision.  *Id*.

5       The question remains whether the complaint in this case

6  provides Defendants with adequate notice of the nature of the breach

7  of contract claim.  The only mention of the "pay promptly" language

8  is in a section of the complaint entitled "Statement of Facts as to

9  All Causes of Action," (SAC ¶11), while the specific breach of

10  contract allegations are found elsewhere (SAC ¶¶ 28-31).  However,

11  the first paragraph of the breach of contract allegation

12  "incorporates, by reference, as though fully set forth, all of

13  the allegations contained in paragraph 1 through 27...."

14  Although the "pay promptly" provision could have been placed more

15  squarely at issue, Plaintiffs have satisfied the minimal pleading

16  standard of Federal Rule of Civil Procedure 8.  Defendants' motion

17  to dismiss the breach of contract claim is **DENIED.**

18

19       **B.    Motion to Strike Breach of Contract Allegations.**

20       Defendant moves in the alternative to strike the allegations

21  contained in Paragraphs 29 & 30 of the SAC.  Specifically, Defendant

22  argues that allegations related to the duties described that are not

23  included in the plain language of the policy should be stricken

24  because they are irrelevant/immaterial.

25       Plaintiff suggests that at least some of these allegations are

26

27

28

material.[4]  For example, Plaintiff argues that CIC has reporting obligations derived from California law, giving rise to the duty "to report promptly to the WCIRB" has been incorporated into the contract. Plaintiff impliedly argues that the other "duties" arise as a result of various verbal promises made by CIC to Lion Raisins. For example, Plaintiff alleges that CIC made assurances that it would "provide top-notch claims representatives," "control costs," "keep Plaintiff informed," etc.  At this stage in the case, it is not possible to determine whether any admissible extrinsic evidence exists that would support amplifying the contract.  Plaintiff may be alleging these duties as part of a foundation for the applicable standard of care in the workers compensation industry.  That relates to the tort claim for negligence.  Whether these specific duties are part of the contract because they were provided by defendant and bargained for by plaintiff is entirely unclear.

On a motion to dismiss, the allegations contained in the complaint are to be assumed true.  It is appropriate to strike these allegations with leave to amend.  "motions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation," *Neveu*, 392 F. Supp. 2d at 1170; it remains to be seen whether Plaintiff can prove the duties alleged are part of the contract or industry standard of care or performance relative to the tort claim. Defendant is entitled to know which.

Defendant's motion to strike language from Paragraphs 29 and 30

---

[4]     Plaintiff also reiterates its argument that the copy of the policy submitted by Defendant should not be considered.  As discussed, this argument is not well founded.

of the complaint is **GRANTED WITH LEAVE TO AMEND.**

**C.   Motion to Dismiss the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim.**

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988), 683-84 (1988) (Citing Rest. 2d Contracts, § 205). In general, because the implied covenant is a considered a contract term, compensation for its breach is generally limited to contract rather than tort remedies. *Id.* However, "an exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that breach of the implied covenant will provide the basis for an action in tort. California has a well-developed judicial history addressing this exception." *Id.*

> There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement....Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

*Id.*

The basic inquiry is "whether the insurer withheld payment of an insured's claim unreasonably and in bad faith." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151-52 (1990). "The duty imposed by law is not unreasonably to withhold payments due under the policy." *Id.* (citing *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 920 (1978).

> Thus, there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause.

*Id.*

Defendant asserts that Plaintiffs have failed to properly state a claim for breach of the implied covenant of good faith and fair dealing for several reasons: (1) in the absence of a contractual breach, there can be no breach of the implied covenant of good faith and fair dealing; (2) the claim is untimely; and (3) the facts as alleged do not state a claim for breach of the implied covenant under California law.

### 1.   Breach of an Express Contract Provision.

The first of these arguments is easily dismissed.  As discussed, Lion Raisins has stated a claim for breach of an express contractual provision - the "promptly pay" provision.  Unreasonable delay in claims processing and payment can support a bad faith denial claim.

### 2.   Timeliness.

As an alternative basis for dismissal, CIC argues that this claim is time-barred.  CIC maintains that the two year statute of limitations applicable to tort actions controls Plaintiff's insurance bad-faith claim in this case.

A cause of action based upon the implied covenant of good faith and fair dealing is a "hybrid action sounding both in tort and contract." *Smyth v. USAA Property & Casualty Ins. Co.,* 5 Cal. App. 4th 1470, 1476-77 (1992).  To determine the applicable statute of limitations, a court must determine whether the claim sounds in contract or in tort by considering "the nature of the right sued upon, not the form of action or the relief demanded....Whether the cause sounds in tort or in contract, therefore, depends upon the facts of the particular case. " *Id.*  As a general rule, where the pleadings "sound in contract and in tort, the plaintiff ordinarily may elect the theory of the case." *Id.*  If the claim sounds in

**16**

contract, then a four-year statute of limitations applies; if the claim sounds in tort, then a two-year statute of limitations applies.

It is not clear from the face of the complaint whether the breach of the implied covenant cause of action sounds in contract, tort, or both.  The complaint alleges that

> [CIC] has failed and refused and continued to fail and refuse to act in good faith and deal fairly with Lion Raisins by:
>
> (a)  Failing to act properly, promptly, reasonably and adequately in the investigation of LION RAISINS' workers' compensation claims;
>
> (b)  Failing to properly control workers' compensation claims and medical expenses so as to avoid unnecessary increases to LION RAISINS' future premiums;
>
> (c)  Basing its claims handling conduct on its desire to reduce or avoid its obligations to LION RAISINS;
>
> (d)  Refusing to give LION RAISINS' interests as much consideration as CONNECTICUT INDEMNITY's;
>
> (e)  Failing and refusing to promptly provide the WCIRB with audit reports so that the WCIRB could accurately, fairly and promptly determine the experience modification rate for LION RAISINS;
>
> (f)  Failing to acknowledge and act reasonably and promptly upon communications with LION RAISINS or its representatives;
>
> (g)  Forcing LION RAISINS to commence this litigation and incur attorneys' fees and hire other professionals to obtain benefits to which LION RAISINS is entitled to under the CONNECTICUT INDEMNITY policies;

(SAC ¶36.)

To the extent punitive damages are sought, the claim for bad faith breach must be in tort, as no punitive damages can be awarded for breach of contract.  Plaintiff, argues that this action arises in tort.  (Doc. 87, Opp'n to CIC's motion to dismiss, at 14 ("For

actions arising in tort, the statute of limitations does not begin
to run until damage has occurred.").)  Whether the complaint
adequately alleges a tortious breach of contract remains to be
determined.  *See infra* Part V.C.4 at 22.  For the purposes of the
timeliness inquiry, it is appropriate to apply the two-year statute
of limitations.

Defendant relies on *Smyth,* 5 Cal. App. at 1476-77, which
concerned the applicability of the two year statute of limitations
to an allegation that an insurer made a false statement concerning a
policy.  The plaintiff in *Smyth* alleged having knowledge of the
false statement at least two and a half years before filing his
complaint.  Accordingly, and without much discussion, the *Smyth*
court found the allegation was <u>untimely</u>.  *Id.*

Lion Raisins maintains that the facts of this case are
distingushable from those in *Smyth*.  The two-year limitations period
does not begin to run until "a party knows or should have known the
facts essential to his claim."  *Love*, 221 Cal. App. 3d at 1143.
Here, Plaintiff maintains that it was not aware of the facts giving
rise to its claims until, October 2001 at the earliest, the first
time it had the opportunity to review CICs insurance files.  Only
after taking a "reasonable amount of time" to review the files did
Plaintiff begin to realize CIC's misconduct.  Therefore, CIC argues,
the filing of its complaint on October 27, 2003 was timely.  These
allegations make Plaintiff's bad-faith claim timely.

> **3.   California Caselaw Supports a Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing in this Case.**

Defendant next points to a line of cases shielding insurers
from liability for alleged mis-handling of claims where the

insurance policy expressly grants the insurer discretion in the manner and method of handling the claims.

For example, in *Western Polymer,* 32 Cal. App. 4th at 23-28, an insured sued its insurer for settling a claim brought by a customer against the insured.  Although the settlement was for less than the policy limits, the insured alleged that the settlement injured its reputation.  The policy in question gave the insurer the right to "make such investigation and settlement of any claim or suit as it deems expedient...."  *Id*.  Such language, the court reasoned, was consistent with the general rule that "the insurer is entitled to control settlement negotiations without interference from the insured." *Id*. (citations omitted).  The *Western Polymer* court acknowledged, however that the implied covenant of good faith and fair dealing operated in some circumstances as a limit on the insurer's discretion.  The court then reviewed a series of California cases from which it elicited the following general rules:

> When resolution of a claim may adversely affect the policyholder in the enjoyment of the policy's benefits and purposes, the insurer becomes obligated, by the implied covenant, to pursue defense and settlement with due, good faith regard to the insured's interests....An insurer cannot unreasonably refuse to settle within policy limits and thus gamble with its insured's money to further its own interests...Similarly, an insurer should not further its own interests by settling a claim within policy limits through the use of the insured's money without some form of consent by the insured.

*Id*. at 26.  Applying these rules to the facts before it, the *Western Polymer* court rejected the insured's argument that the settlement injured its business reputation because "a liability insurance policy's purpose is to provide the insured with a

defense and indemnification for third party claims within the
scope of the coverage purchased, and not to insure the entire
range of the insured's well-being." *Id.* at 27.  The court
reasoned:

> This is not surprising, because the policy language
> informs the insured that the insurer may settle "as it
> deems expedient" any claim or suit, even if the suit's
> allegations are "groundless, false or fraudulent ...."
> No reasonable reading of this language would create an
> expectation that the insurer has to forgo settlement in
> favor of vindicating the insured's reputation.

*Id.*

Similarly in *New Hampshire Insurance Co. v. Ridout Roofing Co.,
Inc.*, 68 Cal. App. 4th 495 (1998), an insured sued for reimbursement
of deductibles under a general liability policy.  The applicable
policy provided for a deductible of $5,000 per occurrence.  *Id.* at
499.  The policy also provided that the insurer "may investigate and
settle any claim or suit at [its] discretion."  *Id.* at 501.  The
plaintiff alleged that the insurer's settling of numerous claims at
or near the per occurrence deductible amount (thereby passing most
of the settlement costs back to the insured) violated the implied
covenant of good faith and fair dealing.  Citing to *Western Polymer*,
the *Ridout* court fund that the implied covenant did not operate to
limit the policy's express grant of discretion to the insurer over
settlements.  *Id.* at 504.

Plaintiff argues that a different line of cases, specifically
addressing workers compensation insurance, controls here. For
example, *Security Officers Serv., Inc. v. State Compensation Ins.
Fund*, 17 Cal. App. 4th 887 (1993), considered whether the implied
covenant of good faith and fair dealing operated to impose liability
upon a provider of workman's compensation insurance.  Among other

**20**

allegations, the plaintiff in *Security Officers* argued that the

insurers "sloth in resolving claims...adversely affected plaintiff's

experience modification rating and consequent premiums."  *Id*. at

891.  Applying the same principles relied upon in *Western Polymer*

and *Ridout*, *Security Officers* rejected the insurer's argument that

it should not be held liable because the policy granted it

discretion to control the defense and the conduct of settlement

negotiations without interference from the insured.  *Id*. at 895.

The reasoning of the *Security Officers* court is instructive and

illustrates the similarity between that case and the facts and

circumstances here alleged:

> [The insurer]...contends that to recognize
> responsibility on account of premium increases would
> conflict with plaintiff's agreement, in the policy, to
> "accept any increase in premium or in the rates of
> premium which may be promulgated under any rating plan
> approved by the Insurance Commissioner...." However,
> the plain significance of this provision points in the
> opposite direction. Under the policy, plaintiff did not
> agree to pay such premiums as [the insurer] might
> discretionarily charge. Rather, plaintiff agreed to pay
> premiums fixed by law and regulations.

> The "Premium" section of the policy, which [the
> insurer] SCIF quotes, begins by stating that "All
> premiums for this policy will be determined by the
> Workers' Compensation Rating Bureau's manual of rules,
> rates, rating plans and classifications." The complaint
> alleges that this regulated system computes premiums
> based in part on the policyholder's experience
> modification, derived from the quantity of outstanding
> claims and the reserves therefor, which plaintiff
> alleges [the insurer] has intentionally and
> unreasonably failed to minimize or reduce. Thus,
> plaintiff is bound to pay [the insurer]-or, allegedly,
> any successive insurer-a policy premium that [the
> insurer] claims and reserves handling will directly
> influence. Because the powers so confided in [the
> insurer's] discretion will impact the degree of
> plaintiff's primary burden under the policy, it appears
> logical that the covenant of good faith and fair
> dealing indeed requires [the insurer] to conduct its
> claims resolution and reserve allocation processes with
> good faith regard for plaintiff's interests.

*Id.* at 896-97.  *See also Lance Camper Manuf. Corp. v. Republic Indem. Co. of Am.*, 44 Cal. Ap. 4th (1996) (finding cause of action existed for claims handling practices that increased reported loses and resulted in higher premiums).

Defendant insists that *Security Officers* and related cases are distinguishable because those cases dealt with insurance policies that had retrospective premium provisions.  But, the policy issued by CIC to Lion Raisins appears to contain just such a provision.  It provides that the "estimated annual premium will be revised when the [WCIRB] issues the applicable experience modification." (*See* Kook Decl., Ex. B at 15.)**⁵**

Finally, Defendant argues that *New Plumbing Contractors, Inc. v. Nationwide Mut. Ins. Co*, 7 Cal. App. 4th 1088 (1992), suggests a different result.  *New Plumbing* concerned an employer that sued its workers' compensation insurer for failing to pursue subrogation rights for a particular claim.  The employer argued that this failure adversely affected its loss experience.  The *New Plumbing* court reasoned that the insurer's decision not to pursue subrogation rights did "not affect the insured's receiving the benefits of the

---

⁵      Defendant also cites *State Comp. Ins. Fund v. McConnell*, 46 Cal. 2d 330, 335 (1956), which defines a retrospective rating plan as one in which "[f]inal determination of premium cost is delayed, being computed retrospectively after the expiration of the insurance and on the basis of paid and actual loss experience during the insurance period." Defendant argues that, here, the loss experience for any particular year only impacts the premiums in subsequent years.  But, this is not a meaningful distinction.  In either case, poor performance by the insurer that adversely affects the loss experience, ends up increasing the premiums paid by the insured, which if unjustified due to poor claims handling by the insurer, benefits the insurer and harms the insured.

insurance agreement." *Id*. at 1096.  Rather, it implicated "the
marketplace aspect of its relationship with [the insurer], not the
fiduciary-type relationship which pertains only to the receipt of
benefits under the insurance policy." *Id*.

The defendant in *Security Officers* made the very same argument
based on the holding from *New Plumbing*, which was rejected:

> *New Plumbing* does not control here, in part because of
> the very distinction the court there noted. The present
> case does challenge the good faith and fair dealing of
> [the insurer's] claims settlement practices. Unlike the
> right of subrogation, which the *New Plumbing* court
> perceived to be entirely personal to the insurer, these
> practices have been held subject to the implied covenant,
> where the insurer's willingness to settle was too low,
> too high, or, here, too slow. Moreover, with deference to
> New Plumbing, in a regulated "marketplace" where the
> insurer's unilateral action can automatically influence
> the premium rates the insured faces, the insured may
> rightly be said to have bargained for good faith claims
> handling not only to avert liability but also restrain
> other financial burdens the insurer may cause it by
> gratuitous or intentional discretionary conduct.

*Security Officers,* 17 Cal. App. 4th at 897-98.   This reasoning,
placing emphasis on the distinction between the right of subrogation
and good faith claims administration practices, is correct.
Defendant has offered no persuasive reason to distinguish the
present case from *Security Officers*.

**4.   Sufficiency of Tortious Conduct Allegations.**

The question still remains whether the complaint states a claim
for <u>tortious</u> breach of the implied covenant of good faith and fair
dealing.  For a tortious breach of the implied covenant, "the
failure to bestow benefits must have been under circumstances or for
reasons which the law defines as tortious." *California Shoppers,
Inc. v. Royal Globe Ins. Co.*, 175 Cal. App.3d 1, 15 (1985).
Specifically, "the reason for withholding benefits must have been

1  unreasonable or without proper cause." *Love,* 221 Cal. App. 3d at

2  1151-52 (1990) (citing *Neal*, 21 Cal. 3d at 920).  The complaint as

3  currently plead contains a number of allegations that the CIC acted

4  "unreasonably" or "with a willful and conscious disregard for the

5  rights of LION RAISINS" in mishandling and delaying claims and in

6  late reporting that all combined to accrue to CIC's benefit at

7  Plaintiff's expense in the alleged unjustified increase of workers

8  compensation premiums.  Defendants' motion to dismiss the second

9  cause of action (breach of the implied covenant) is **DENIED.**

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17      **D.   Motion to Strike Allegations Regarding CIC's Purported Economic Motive from the Breach of the Implied Covenant**

18          **of Good Faith and Fair Dealing Claim**.

19      Defendant moves in the alternative to strike the entirety of

20  Paragraph 41 of the complaint, containing Plaintiff's contention

21  that the CIC "breached its obligations of good faith and fair

22  dealing for the purposes of receiving higher premiums and increasing

23  its revenue and surpluses while impairing Lion Raisins' financial

24  interest."  The analysis of the second claim is equally applicable.

25  This motion is **DENIED AS MOOT.**

26

27      **E.   Motion to Dismiss the Fraud Causes of Action**.

28      Plaintiff's third and fourth causes of action allege that CIC

**24**

1   made statements to Lion Raisins that constitute both intentional and

2   negligent misrepresentation.   Defendant moves to dismiss both of

3   these claims on a number of grounds.

    **1.   Intentional Misrepresentation.**

5       Plaintiff's intentional misrepresentation claim consists, in

6   pertinent part, of the following factual allegations:

>           In order to convince Plaintiff to execute a contract
>           with the Defendant for Plaintiff's worker's
>           compensation needs, the <u>Defendant made representations
>           to Plaintiff regarding its expertise in the field of
>           workers' compensation and its dedication to Plaintiff's
>           needs</u>. Plaintiff reasonably relied upon said
>           representations as Plaintiff had no reason to
>           disbelieve Defendant's claims as to its expertise and
>           world renown reputation, in handling matters such as
>           workers' compensation matters. At the time said
>           representations were made by the Defendant, the
>           Defendant knew that it did not have such expertise,
>           experience in their claims managers, or workers'
>           compensation expertise in the State of California. Said
>           misrepresentations by the Defendant caused the
>           Plaintiff to execute the written agreement, causing
>           Plaintiff damage in an amount in excess of the
>           jurisdictional limits for Federal Court jurisdiction.
>           (SAC ¶45 (emphasis added).)
>
>           In and around December, 1999 CONNECTICUT INDEMNITY or
>           its agent represented to LION RAISINS that it was
>           <u>committed to conducting prompt and thorough
>           investigation of workers' compensation claims</u>.
>           CONNECTICUT INDEMNITY and/or its agents <u>also
>           represented that it was committed to promoting superior
>           claims handling and that it would handle claims to
>           prevent overpayment</u>.  (SAC ¶46.)
>
>           The representations made by CONNECTICUT INDEMNITY
>           and/or its agents in and around December, 1999 to
>           induce LION RAISINS to purchase the CONNECTICUT
>           INDEMNITY policy were false. CONNECTICUT INDEMNITY
>           and/or its agents knew that their representations were
>           false when made, or, at the very least, were reckless
>           in making these representations without knowing whether
>           they were true or false.    (SAC ¶47.)
>
>
>           CONNECTICUT INDEMNITY and/or its agents made the
>           representations with an intent to induce LION RAISINS to
>           purchase the workers' compensation policy from
>           CONNECTICUT INDEMNITY.  (SAC ¶48.)

1
2
3

LION RAISINS were unaware of the falsity of the
representations made by CONNECTICUT INDEMNITY and/or its
agents. LION RAISINS acted in reliance on the truth of
the representations and were justified in their reliance
on the representations.   (SAC ¶49.)

4  (emphasis added).

5      Defendant argues (1) the alleged misrepresentations are

6  inactionable "puffery"; (2) the complaint lacks the specificity

7  required by Federal Rule of Civil Procedure 9(b); and (3) an alleged

8  failure to perform a contractual obligation, without more, does not

9  amount to intentional misrepresentation.

10                    a.    _Puffery_.

11      An alleged misrepresentation must "ordinarily be a specific

12  factual assertion; generalized statements are usually not actionable

13  as fraud." _Glenn Holly Entertainment, Inc. v. Tektronix, Inc._, 100

14  F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) (applying California law).

15  However, certain generalized or speculative statements, often termed

16  "puffery," cannot form the basis of a cause of action for fraud.

17  Puffery has been defined as "generalized or exaggerated statements

18  such that a reasonable consumer would not interpret the statement as

19  a factual claim upon which he or she could rely." _Id_.   In contrast,

20  "statements about specific or absolute characteristics of a product

21  are considered specific statements and may be actionable statements

22  of fraud." _Id_.   The critical theme "is that consumer reliance will

23  be induced by specific rather than general assertions." _In re All_

24  _Terrain Vehicle Litig._, 771 F. Supp 1057, 1061 (C.D. Cal. 1991).

25      _All Terrain Vehicle Litigation_, provides a number of

26  examples the kind of statements that constitute puffery, albeit

27  in the context of a very different contractual relationship:

28                    [E]xamples of puffing alleged include

**26**

> the...allegations that ATV's were advertised as "precisely balanced in the frame for superb handling," "the ultimate recreational vehicle," and that ATV's "will embarrass the wind." Most of these slogans do not make representations capable of being classified as true or false. To the extent that the slogans do make affirmative representations, the representations are mere sales puffing and, therefore, are not actionable RICO mail or wire fraud.

771 F. Supp at 1060.

Defendant asserts that the alleged misrepresentations set forth in the operative complaint are "puffery." Specifically, Plaintiff alleges that Defendant "made representations to Plaintiff regarding its expertise in the field of workers' compensation and its dedication to Plaintiff's needs" (SAC ¶46), stated that it was "committed to conducting prompt and thorough investigation of workers' compensation claims" and "represented that it was committed to promoting superior claims handling and that it would handle claims to prevent overpayment" (SAC ¶47).

Here, specific representation are mixed in with some generalized exaggerations. On the one hand, promising to "promot[e] superior claims handling" and assuring "dedication to Plaintiff's needs" are the kinds of generalized sales statements that cannot form the basis of a claim for fraud. On the other, Defendant's alleged representation that it has expertise in the field of workers' compensation, that it would investigate claims promptly and thoroughly, and would handle claims to prevent overpayment are specific representations that can be actionable if true and were made with the intent to defraud (promise without intent to perform).

> b.   _Lack of Specificity (Rule 9b)_.

Plaintiff's fraud claims also must satisfy the heightened

pleading standard set forth in Federal Rule of Civil Procedure 9b, which provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

One of the purposes behind Rule 9(b)'s heightened pleading requirement is to put defendants on notice of the specific fraudulent conduct in order to enable them to adequately defend against such allegations. *See In re Stac Elec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). Furthermore, Rule 9(b) serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.*

As a general rule, fraud allegations must state "the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Scheiber Distrib. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Where fraud allegedly occurred over a period of time, however, Rule 9(b)'s requirement that the circumstances of fraud to be stated with particularity are less stringently applied. *See Fujisawa Pharm. Co., Ltd. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993); *U.S. ex rel. Semtner v. Med. Consultants, Inc.*, 170 F.R.D. 490, 497 (W.D. Okla. 1997).

Here, Plaintiff alleges that CIC "made representations to Plaintiff regarding its expertise in the field of workers'

1   compensation and its dedication to Plaintiff's needs," represented

2   to Plaintiff "that it was committed to conducting prompt and

3   thorough investigation of workers' compensation claims" and that it

4   would "handle claims to prevent overpayment."  (SAC ¶¶ 45-46.)

5   Plaintiff specifies that these representations were made in or

6   around December 1999 by "Connecticut Indemnity or its agent."  (SAC

7   ¶46.)

8        Defendant argues that these allegations are not specific

9   enough, pointing to *Silicon Knights Inc. v. Crystal Dynamics Inc.*,

10  983 F. Supp. 1303, 1315 (N.D. Cal. 1996).  In that case, plaintiff

11  alleged generally that defendant repeatedly promised to pay

12  plaintiff royalties for its works and that defendant failed to

13  advise plaintiff of aspects of a third-party contract that would

14  affect those royalties.  The *Silicon Knights* court dismissed the

15  fraud claims for lack of specificity, reasoning that:

16  **//**

17  **//**

18              None of the complaint's allegations of fraud state the
            time, place and manner of the alleged misrepresentations.
19          Furthermore, only a few of the alleged misrepresentations
            identify the person who made the statement. Since fraud
20          must be alleged in particularity, a general allegation
            that all Individual Defendants directed that the alleged
21          fraudulent statements be made is insufficient to assert
            liability upon persons who did not make the statements.
22
    *Id.*
23
         Here, although the complaint alleges a month-long time frame
24
    for the alleged misrepresentations and provides a general
25
    description of the nature of the allegedly fraudulent statements,
26
    Plaintiff provides no specifics as to <u>who</u> made the statements or to
27
    whom the statements were made.  This is not sufficient in the Ninth
28

1  Circuit under *Schreiber*, 806 F.2d at 1401.  Plaintiff must amend the

2  complaint to identify the time, place and identity of the speaker

3  and the recipient of the misrepresentations.

4          c.  *Allegation of mere non-performance fails to*
             *state a claim for intentional*
5          *misrepresentation.*

6          Defendant also argues that the intentional misrepresentation

7  claim, as alleged, fails to stat a claim under California law.

8  "[S]omething more than nonperformance is required to prove the

9  defendant's intent not to perform his promise."  *Tenzer v.*

10  *Superscope Inc.*, 39 Cal. 3d 18, 30 (1985).  Accordingly, Plaintiff

11  must allege specific facts suggesting that CIC did not intend to

12  fulfil its obligations at the time it made the allegedly fraudulent

13  statements.

14          Plaintiff's attempts to distinguish *Tenzer* and other cases

15  cited by Defendant are not persuasive.  For example, Plaintiff

16  points out that the *Tenzer* court acknowledged that fraudulent intent

17  "has been inferred from such circumstances as defendant's

18  insolvency, his hasty repudiation of the promise, his failure even

19  to attempt performance, or his continued assurances after it was

20  clear he would not perform."  *Id*. at 30.  However, Plaintiff fails

21  to allege any similar facts with respect to CIC as to a promise made

22  without the intent to perform.  There is no suggestion that CIC

23  failed to attempt performance or that it made continued assurances

24  in the face of apparent non-performance.

25          Defendants' motion to dismiss the third cause of action for

26  intentional misrepresentation is **GRANTED WITH LEAVE TO AMEND.**

27

28          **2.   Negligent Misrepresentation.**

30

1    Plaintiff's negligent misrepresentation claim alleges in its

2  entirety:

3          At the time Defendant <u>made the representations as</u>
           <u>described in paragraph 35 above,</u> Defendant knew or should
4          have known that said representations were false, but
           Defendant negligently made such representations anyway
5          in order to induce Plaintiff to enter into the
           insurance policy contract in question, and to not enter
6          into an insurance policy contract for workers'
           compensation through any other workers' compensation
7          insurance company. Plaintiff relied on said
           representation to its damage in an amount in excess of
8          the jurisdictional limits and in an amount according to
           proof.
9
   (SAC ¶53 (emphasis added).)  Paragraph 35, in turn, provides:
10
           Another benefit of the bargain to which LION RAISINS
11         was entitled was the peace of mind that CONNECTICUT
           INDEMNITY would not improperly delegate its duty and
12         responsibility to promptly, reasonably and in good
           faith investigate and handle claims submitted by LION
13         RAISINS and that CONNECTICUT INDEMNITY would give at
           least as much consideration to LION RAISINS' interests
14         as CONNECTICUT INDEMNITY gave its own interests.

15  (SAC ¶35.)  Paragraph 35 provides absolutely no specific information

16  about any alleged misrepresentations.  This claim for negligent

17  misrepresentation, which is also subject to the pleading

18  requirements of Rule 9(b), must be dismissed for lack of

19  specificity, as no specifics facts about the alleged

20  misrepresentations are set forth in the complaint.

21    Defendant also argues that allegations of a negligent false

22  promise do not state a cause of action for negligent

23  misrepresentation.  Defendant relies principally on *Tarmann v. State*

24  *Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991), in which

25  an insured alleged that her car insurance provider represented that

26  it would pay for her car repairs immediately upon completion of the

27  work.  The plaintiff alleged that the promise constituted a

28  negligent misrepresentation because the insurer knew it was false at

**31**

1  the time it was made.  The *Tarmann* court held that "predictions as

2  to future events, or even statements as to future action by some

3  third party, are deemed opinions and not actionable fraud."  Here,

4  however, Plaintiff alleges in other portions of the complaint that

5  CIC made misrepresentations as to past or existing material facts

6  about its workers compensation administration practices.  For

7  example, Plaintiff alleges that CIC made representations as to the

8  expertise of its staff.  Such an allegation, if pled with sufficient

9  specificity, may support a claim for negligent misrepresentation

10 about CIC's ability to promptly and competently administer claims.[6]

11     Defendants' motion to dismiss the fourth cause of action

12 (Negligent Misrepresentation) is **GRANTED WITH LEAVE TO AMEND.**

13 //

14 //

15 //

16 //

17     **F.   <u>Motion to Strike Punitive Damages Allegations</u>.**

18     Defendant moves to strike all allegations from the complaint

19 concerning Punitive Damages, which are contained within Paragraphs

20 42, 43, 51 and Paragraph E of the Prayer for relief.

21     As the bad faith breach of contract claim has survived,

22 punitive damages may be sought.

23     The parties argue over the burden of proof at the motion to

24 dismiss stage.  The availability of punitive damages is governed

25 ─────────────

26     [6]   Finally, Defendant also argues that the negligent
    misrepresentation claim is time-barred as it is subject to the
27 same two-year statute of limitation applicable to the breach of
    the implied covenant of good faith and fair dealing claim.
28 Defendant's untimeliness argument has been rejected.

by California Civil Code § 3294, which provides:

> In an action for the breach of an obligation not
> arising from contract, where it is proven by clear and
> convincing evidence that the defendant has been guilty
> of <u>oppression, fraud, or malice,</u> the plaintiff, in
> addition to the actual damages, may recover damages for
> the sake of example and by way of punishing the
> defendant.

§ 3294(a)(emphasis added). Section 3294(c) defines the terms
"malice," "oppression," and "fraud":

> (1) "Malice" means conduct which is intended by the
> defendant to cause injury to the plaintiff or
> despicable conduct which is carried on by the defendant
> with a willful and conscious disregard of the rights or
> safety of others.

> (2) "Oppression" means despicable conduct that subjects
> a person to cruel and unjust hardship in conscious
> disregard of that person's rights.

> (3) "Fraud" means an intentional misrepresentation,
> deceit, or concealment of a material fact known to the
> defendant with the intention on the part of the
> defendant of thereby depriving a person of property or
> legal rights or otherwise causing injury.

To recover punitive damages under this provision, Plaintiff
must establish by clear and convincing evidence that defendant
acted with "oppression, fraud, or malice." *Aquino v. Superior
Court*, 21 Cal App. 4th 847, 857 (1993).[7]

---

[7]   The Ninth Circuit also demands an almost certain
showing of intent to justify an award of punitive damages under
Title VII.

> An award of punitive damages under Title VII is proper where
> the acts of discrimination giving rise to liability are
> willful and egregious, or display reckless indifference to
> the plaintiff's federal rights. In such circumstances,
> society has a strong interest in punishing the tortfeasor,
> and exemplary damages are most likely to deter others from
> undertaking similar actions. Punitive damages may not be
> awarded, however, where a defendant's discriminatory conduct

1    Defendant suggests that it is Plaintiff's burden at this
2  stage to plead facts that support a punitive damages cause of
3  action.  In contrast, Plaintiff argues that the liberal federal
4  pleading standards under Rule 8 should trump the heightened
5  standard of proof required under Civil Code section 3294 in the
6  context of a motion to dismiss.
7    At least one federal district court has held that section
8  3294's higher standard applies at "all stages of the proceeding."
9  *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1231 (C.D. Cal.
10 2002), but that case was decided on summary judgment and did not
11 directly address the pleading standard.  At least two federal
12 cases have eliminated punitive damages claims brought under
13 section 3294 at the motion to dismiss stage.  *See Brown v.*
14 *Adidas*, 938 F. Supp. 628, 635 (S.D. Cal. 1996); *Von Grabe v.*
15 *Sprint PCS*, 312 F. Supp. 2d 1285, 1309 (S.D. Cal. 2003).  But in
16 both *Brown* and *Grabe*, the complaints alleged only breach of
17 contract claims, which did not meet section 3294's express
18 application only to cases where there has been a "breach of an
19 obligation not arising from contract."  Here, Plaintiff alleges
20 tort-based claims.  At the pleading stage, a failure to set forth
21
22        is merely "negligent in respect to the existence of a
          federally protected right," Hernandez-Tirado, since
23        society's interest in punishing the tortfeasor is
          substantially reduced in such cases, and the deterrent
24        effect of exemplary damages is likely to be much weaker.
          Thus, to be entitled to an award of punitive damages, the
25        plaintiff must demonstrate that the defendant "almost
          certainly knew that what he was doing was wrongful and
26        subject to punishment.
27
   *Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir.
28 1998).

**34**

"clear and convincing evidence" of entitlement to punitive damages will not apply.  However, the more stringent standard of proof, requiring "clear and convincing evidence" will apply on summary judgment and at trial.  The motion to strike Plaintiff's punitive damages claim is DENIED.

### G.  **Motion to Strike Claim For Attorney's Fees**.

Lion Raisins seeks attorneys fees in connection with its second cause of action (breach of the implied covenant of good faith and fair dealing), relying principally on *Brandt v. Superior Court*, 37 Cal. 3d 815 (1985).  In *Brandt*, an insured sought attorney's fees in connection with an insurance company's allegedly tortious conduct.  The *Brandt* court held that

> [W]hen the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which detriment...includes those attorney's fees that were <u>incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct</u>.

*Id*. at 819 (emphasis added).  However the *Brandt* court qualified its holding by stating:

> The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable.

*Id*.  "Fees expended on obtaining amounts in excess of the policy, such as consequential damages, aren't recoverable." *Slottow v. Am. Ca. Co.*, 10 F.3d 1355, 1362 (9th Cir. 1993).

Defendant moves to strike this request, arguing that the rule set

35

forth in *Brandt* does not apply here.  Plaintiff does not allege it did not receive coverage to which it was entitled.  It will not incur any attorney's fees obtaining bargained for insurance coverage Rather, Plaintiff seeks consequential damages in the form of increased premiums due to Defendant's alleged breaches.  *Brant* does not authorize recovery of attorney's fees for such claims.  The motion to strike the attorney's fees demand is **GRANTED WITH LEAVE TO AMEND**.

## VI.   CONCLUSION

For the reasons set forth above:

(1)   Defendant's motion to dismiss the first cause of action (breach of contract) is **DENIED**;

(2)   Defendant's motion to strike language from the first cause of action (breach of contract) is **GRANTED WITH LEAVE TO AMEND.**

(3)   Defendant's motion to dismiss the second cause of action (breach of the implied covenant of good faith and fair dealing) is **DENIED**;

(4)   Defendant's motion to strike portions of the second cause of action (breach of the implied covenant of good faith and fair dealing) is **DENIED**;

(5)   Defendant's motion to dismiss the third cause of action (intentional misrepresentation) is **GRANTED WITH LEAVE TO AMEND**;

(6)   Defendant's motion to dismiss the fourth cause of action (negligent misrepresentation) is **GRANTED WITH LEAVE TO AMEND**;

(7)   Defendant's motion to strike Plaintiff's demand for punitive damages is **DENIED.**; and

(8)   Defendant's motion to strike Plaintiff's demand for attorney's

fees is **GRANTED WITH LEAVE TO AMEND.**


Plaintiff shall submit any amended pleading within **twenty (20)**

days of service of this order.


**SO ORDERED**

Dated: March 2, 2006                    /s/ OLIVER W. WANGER

_____
                    **Oliver W. Wanger**
                **UNITED STATES DISTRICT JUDGE**